**Murray A. BROWN**

v.

**UNITED STATES of America et al.**
**No. CA 3-5642-C.**

United States District Court,
N. D. Texas,
Dallas Division.
June 25, 1974.

Byron L. Williams, Dallas, Tex., for plaintiff.

Frank D. McCown, U. S. Atty., Charles D. Cabaniss, Asst. U. S. Atty., Dallas Tex., for defendants.

MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

Plaintiff is a "preference eligible employee" under 5 U.S.C. §§ 2108 and

7511 [1] which means that he can only be removed for such cause as will promote the efficiency of the service under 5 U. S.C. § 7512.[2]

He was removed from his position as Supervisory Criminal Investigator, GS–13, employed by the Bureau of Narcotics and Dangerous Drugs (B.N.D.D.) for conduct prejudicial to the government.[3]

1. 5 U.S.C. § 2108

For the purpose of this title—

(1) "veteran" means an individual who—

(A) served on active duty in the armed forces during a war, in a campaign or expedition for which a campaign badge has been authorized, or during the period beginning April 28, 1952, and ending July 1, 1955; or

(B) served on active duty as defined by section 101(21) of title 38 at any time in the armed forces for a period of more than 180 consecutive days after January 31, 1955, not including service under section 511(d) of title 10 pursuant to an enlistment in the Army National Guard or the Air National Guard or as a Reserve for service in the Army Reserve, Naval Reserve, Air Force Reserve, Marine Corps Reserve, or Coast Guard Reserve;

and who has been separated from the armed forces under honorable conditions;

(2) "disabled veteran" means an individual who has served on active duty in the armed forces, has been separated therefrom under honorable conditions, and has established the present existence of a service-connected disability or is receiving compensation, disability retirement benefits, or pension because of a public statute administered by the Veterans' Administration or a military department; and

(3) "preference eligible" means—

(A) a veteran as defined by paragraph (1)(A) of this section;

(B) a veteran as defined by paragraph (1)(B) of this section;

(C) a disabled veteran;

(D) the unmarried widow of a veteran;

(E) the wife of a service-connected disabled veteran if the veteran has been unable to qualify for any appointment in the civil service or in the government of the District of Columbia;

(F) the mother of an individual who lost his life under honorable conditions while serving in the armed forces during a period named by paragraph (1)(A) of this section, if—

(i) her husband is totally and permanently disabled;

(ii) she is widowed, divorced, or separated from the father and has not remarried; or

(iii) she has remarried but is widowed, divorced, or legally separated from her husband when preference is claimed; and

(G) the mother of a service-connected permanently and totally disabled veteran, if—

(i) her husband is totally and permanently disabled;

(ii) she is widowed, divorced, or separated from the father and has not remarried; or

(iii) she has remarried but is widowed, divorced, or legally separated from her husband when preference is claimed.

5 U.S.C. § 7511

For the purpose of this subchapter—

(1) "preference eligible employee" means a permanent or indefinite preference eligible who has completed a probationary or trial period as an employee of an Executive agency or as an individual employed by the government of the District of Columbia, but does not include an employee whose appointment is required by Congress to be confirmed by, or made with the advice and consent of, the Senate, except an employee whose appointment is made under section 3311 of title 39; and

(2) "adverse action" means a removal, suspension for more than 30 days, furlough without pay, or reduction in rank or pay.

2. 5 U.S.C. § 7512

(a) An agency may take adverse action against a preference eligible employee, or debar him for future appointment, only for such cause as will promote the efficiency of the service.

(b) A preference eligible employee against whom adverse action is proposed is entitled to—

(1) at least 30 days' advance written notice, except when there is reasonable cause to believe him guilty of a crime for which a sentence of imprisonment can be imposed, stating any and all reasons, specifically and in detail, for the proposed action;

(2) a reasonable time for answering the notice personally and in writing and for furnishing affidavits in support of the answer; and

(3) a notice of an adverse decision.

(c) This section does not apply to the suspension or removal of a preference eligible employee under section 7532 of this title.

3. 28 C.F.R. 45.735–18, which reads:

No employee shall engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government.

The B.N.D.D. proceedings were held under subpart B of Part 771 of 5 C.F.R., subparts A and B of Part 752 of 5 C.F.R., subpart C of Part 772 of 5 C.F.R., 5 U.S.C. § 7512(b) and 5 U.S.C. § 7701.

He filed this review under 5 U.S.C. § 702[4] and resultantly the scope of review is controlled by 5 U.S.C. § 706.[5]

The Court finds that Mr. Brown has complied with the administrative procedures applicable, exhausted his administrative remedies, has standing to complain in this Court of the adverse decision of the B.N.D.D. and Civil Service Commission (Commission), and has timely filed his complaint.

The facts of the incident which is the root of all of the previous administrative proceedings and this action are in little dispute.

Plaintiff shortly after midnight on October 3, 1970, stopped at the Debonair Club in Dallas, Texas. He testified at the agency hearing that he saw a woman entering the club whom he believed to be someone that the Dallas County Sheriff's Department was seeking. He entered the club, bought a beer and looked the place over for the woman that he had seen outside. He saw a woman from the back who appeared to be dressed similarly to the woman he had seen outside. He sat down at a nearby table and after the woman and her companion left for the restroom, Plaintiff moved over to their table. He took a wallet out of a purse and looked at the Texas Drivers License in it from which he ascertained that the owner of the purse was not the person being sought by the Dallas County Sheriff's Department.

Mr. Brown was observed checking the purse by other persons in the club and subsequently charged with stealing $6.00 from the purse, of which charge he was later found innocent by a jury in a Texas State Court.

Plaintiff made a full report to his superiors of the incident.

Based upon this report and an investigation by the B.N.D.D., Mr. Brown was sent a notice of proposed discharge, dated December 16, 1970, by N. B. Coon, Assistant Director for Administration, B.N.D.D.

The reasons given for the proposed discharge were (1) the operative facts as stated, (2) the alleged illegality of them, (3) the alleged contrariness of those acts to sections 5341, 5342 and 5347 of the B.N.D.D. Agents Manual and that his action was improper and beyond the scope of his authority.

The scope of judicial review allowed by 5 U.S.C. § 706 that pertains to our case is twofold. The questions presented are whether the "agency action, find-

---

4. 5 U.S.C. § 702
  A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5. 5 U.S.C. § 706
  To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
    (1) compel agency action unlawfully withheld or unreasonably delayed; and
    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
      (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
      (B) contrary to constitutional right, power, privilege, or immunity;
      (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
      (D) without observance of procedure required by law;
      (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
      (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
  In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

ings and conclusions . . . (are) . . .

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (and)

(D) without observance of procedure required by law; . . ."

These are, in other terminology, substantive due process and procedural due process.

## I.

Plaintiff has contended that the checking of the woman's purse was condoned and induced by B.N.D.D. Also, that its agents were trained in such conduct, such conduct was common in the B.N.D.D. and agents were directed and praised for such conduct.

This contention was not made by Plaintiff in the B.N.D.D. hearing but was fully contended in the Commission proceedings.

The only language in either of the two Commission opinions that can be said to have dealt with this contention is in the Appeals Examiner's opinion when he said at page 3: "we cannot agree that a surreptitious search of a woman's purse outside her presence, constitutes a proper method of identifying a person."

█ It is elementary that an arm of the Federal Government cannot acquiesce, let alone train, employees for certain conduct, direct them to enter into it, praise them in some instances for such conduct, then turn around and in another instance discharge an employee for that conduct.[6]

Mr. Brown testified at the hearing held by Assistant Appeals Examiner Charles K. Tinkler of the Commission that when agents were working undercover and meeting unidentified people that one of their first objectives was to identify the person and that agents received training and instructions how to do so. He further testified that various surreptitious methods were used to identify people.[7] To lend credence to his testimony, Plaintiff put a few documents into evidence.

The first of these is a set of materials from a Treasury Law Enforcement Officer Training School,[8] the subject being surveillance. There are several methods of obtaining information in it that at the very lowest minimum imply acts similar to those that Plaintiff has been charged with.

The first is the situation where the subject of the surveillance boards a train, boat, plane, or long distance bus. The handout says at page ten:

"3. The possibility of examining the subject's luggage in the railroad station or on the train should not be overlooked."

When a subject registers at a hotel the handout says at page eleven:

"4. The possibilities of trash coverage and surreptitious entry should not be overlooked."

Page 16 has one entire heading, "E. Tampering with subject's automobile," which reads:

1. Occasionally it may not be possible to secure a surveillance car capable of matching the speed of the subject's car, and the subject's car may be slowed down by:

a. Cutting the supply of gas into the carburetor (sic).

b. Loosening spark plugs.

c. Bending the exhaust pipe until it is partially closed.

2. The subject's car can also be more easily distinguished at night by inserting a stronger bulb into its tail

---

6. Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968).

7. Exactly what Plaintiff testified to is impossible to determine as the Court only has the Hearing Examiner's summary before it, no verbatim transcription. See part two of the opinion.

8. Each page of this handout has at the bottom, and underlined, FOR OFFICIAL USE ONLY. It is easy to see why the Treasury did not wish the handout to become public.

light or by removing the red lens from the light.

Page 18 tells us that microphone installations are equipment that may be great assets and "will often produce information of great value."

"m." on page 20 reads "In some cases, fluid or powder leaking from the subject's car trunk or a container under the car may be helpful in following the automobile route taken by the subject."

On pages 20 and 21 is a list of general principles.

"L" is:

"If baggage or rooms are searched, great care must be taken to leave everything in the same condition in which it was found. Restore each object examined to its original position and condition as soon as possible after disturbing it."

"P" is: "Coverage of mail is often desirable."

"S" recites:

"Arrange for garbage and trash examination. Many valuable leads and much information may be found in papers and correspondence found in a subject's trash or garbage."

Not each of these excerpts implies illegal or unconstitutional acts but in the context of the handout lend themselves to the reasonable inference that the drafter of the handout and the instruction program which the handout was a part of contemplated illegal and unconstitutional acts.

Another of Plaintiff's exhibits was one entitled "Bureau of Narcotics, Treasury Department, Criminal Investigation (Treasury Agent) (Narcotics), GS–1811–9, Position Description." One sentence of this document is relevant to our present controversy. It reads:

"Must originate and carry out ways and means of gaining access to persons and places under adverse conditions, must obtain information and evidence by such methods as will go un-

detected or fail to indicate true identity."

Plaintiff admits that these documents are old and that they were given to him by a predecessor agency to B.N.D.D. They therefore would carry little probative value without newer corroborative evidence. Plaintiff has produced such evidence; his testimony and a Memorandum of Supervisory Conference Notes, June 10, 1970, dictated by C. J. Karadimos, Plaintiff's Supervisor. Paragraph 5 is headed "Airline Security". Its third paragraph reads:

In rare instances it will be advisable to search a passenger's luggage. In such cases contact should first be made with one of the above security representatives who will see that the luggage is moved by one individual to a secluded area where the search can be conducted as discreetly as possible. Under no circumstances should we become careless so as to bring embarrassment to the airlines. We must also recognize that any such searches that turn up evidence would be evidence that is not admissible in court for charging a potential defendant. In most instances, wherever practical, contact with a security representative should be made by a supervisor or senior agent.

The meeting which this memorandum relates to occurred only four months before the incident in the Debonair Club. Mr. Lenck, the B.N.D.D.'s representative at both the B.N.D.D. and the Commission hearings, testified at the Commission hearing and tried at that time to distinguish the Debonair Club situation as not being related to any drug crime.

The Assistant Hearing Examiner of the Commission gave short shrift to this contention in his opinion in finding no fault in trying to assist an officer of another law enforcement agency in locating a missing person. His only quarrel was the method used by Plaintiff.

The Court readily accepts the conclusion of the Assistant Hearing Examiner that Plaintiff was proper in aiding an-

other officer and would not want to comment on whether the surreptitious search was a proper method of identifying a person under the Constitution of these United States as that is not the specific issue before the Court.

B.N.D.D. is particularly hard pressed to attempt to distinguish the situation at the Debonair Club when Sections 4401 and 4404.1 of the B.N.D.D.'s Agent's Manual impose the duty of rendering "full cooperation and assistance . . . to state and local officers." Also the position description of Supervisory Criminal Investigator promulgated by Mr. Coon for the Director on January 17, 1969, says in part II, paragraph 4: "Directs and participates in the development of intelligence on criminal operations, drug promoters, and extremist groups in the Region. Develops and maintains cooperative working relationships with State and local law enforcement agencies . . . ." Not only is a supervisory criminal investigator supposed to develop good relationships with other law enforcement agencies, he is expected to keep tabs on other law enforcement areas than drug control. It is incongruous to argue that a man is supposed to develop intelligence about other areas than drug control and to argue that the methods that an agent has been trained and directed to use are inapplicable in doing so.

Plaintiff produced evidence of his defense of training and direction in the type of conduct that he was charged with that was substantial in nature and which was never essentially disputed by B.N.D.D. Plaintiff was specifically charged with violations of Sections 5341, 5342 and 5347 of the B.N.D.D. Agent's Manual.[9] None of these sections forbid positive testimony that there was no duress or coercion, actual or implied. The Government must show that the consent is unequivocal, specific, and freely and intelligently given. The burden on the Government, and directly on the agent, is particularly heavy in cases where the individual is under arrest. Non-resistance to suggestions of an agent may frequently occur; however, mere acquiescence or failure by the individual to assert his rights does not necessarily constitute true consent free of fear or pressure. Unquestionably, a signed consent is stronger evidence than an oral consent to show (1) that the consent was actually given (2) that the individual was fully aware of his rights, and (3) that the individual was afforded the opportunity to ponder the issue and reflect upon the consequences of his actions, prior to giving his consent.

Therefore, Agents are required to obtain written consent from the person before conducting a consent search.

Agents are reminded that probable cause to believe that illicit drugs are on the premises does not, per se, authorize a search of the premises. Search of the premises is permissible only pursuant to (1) a search warrant, (2) a search of the area under the individual's immediate control as an incident to a valid arrest, or (3) a consent search. Of course, probable cause must be the basis upon which a search warrant may be obtained, or the basis to arrest a person at his residence, and thereby conduct a valid search of the residence.

---

9. Section 5341, (B.N.D.D. Agent's Manual) Search and Seizure Authority

BNDD agents have authority to make, prior to institution of libel proceedings under 21 U.S.C. § 334(a)(2), seizures of drugs, containers, equipment, punches, dies, plates, stones, labeling or other things if they are, or the agent or officer has reasonable grounds to believe that they are, subject to seizure and condemnation under 21 U.S.C. BNDD agents also have authority to seize any narcotic drugs, marihuana and dangerous drugs which are possessed in violation of any laws thereto (26 U.S.C. §§ 4706, 4714, 4733, 4745, 21 U.S.C. § 334).

BNDD agents also have authority to seize any vessels, vehicles or aircraft used to possess, transport or conceal contraband narcotic drugs or marihuana (49 U.S.C. §§ 781–788).

Section 5342, (B.N.D.D. Agent's Manual) Search and Seizure Policy

Agents should keep in mind that the courts have indicated they will endeavor to sustain a seizure based upon a search warrant; whereas, the courts have also indicated that investigative technique employing arrest as a guise for securing evidence will be subjected to close scrutiny. A search warrant will be obtained rather than relying on a warrantless search.

Section 5347, (B.N.D.D. Agent's Manual) Consent Searches

As a practical matter. it is difficult for the Government to justify a search based entirely upon consent. The Government has the burden of convincing the court by clear and

or condemn any conduct. They use such language as "Agents should keep in mind . . .", "as a practical matter . . . ." These are at most guidelines which an agent should contemplate when trying to obtain evidence to be used in a court. They do not in any way contemplate the situation that Murray Brown was in at the Debonair Club or Mr. Karadimos' luggage search.

Plaintiff was charged with violating these vague guidelines where the evidence was that a whole other field of conduct by agents with a different purpose than the obtaining of admissible evidence has existed in the practice and procedure of the B.N.D.D.

■ The Court concludes that Plaintiff did establish his defense before the Commission and that the action of the Commission was therefore arbitrary and capricious in ignoring the defense and, upholding his discharge.

## II.

Plaintiff clearly was not provided with procedural due process in three ways.

■ First, he requested eight witnesses be produced by B.N.D.D. under 5 C.F.R. 772.305(c)(2).[10] Plaintiff notified the Commission in a letter dated March 22, 1971, that he was requesting

An agent must realize that even though the arrest warrant has been issued, it is often desirable to also obtain a search warrant for the defendant's premises in order for the agent to expand on his ability to undertake a more thorough search than is allowable under a search incident to arrest. Under no circumstances, is an agent to rely on the probability of obtaining consent from the person arrested when there is time to plan the arrest. There is no reason for not obtaining a search warrant if there is probable cause to believe the defendant has contraband concealed on his premises and such search warrant authority is to be routinely sought.

If a person has been arrested, it is generally not acceptable to obtain a consent to search his premises beyond the agent's authority under a search incidental to an arrest or the area under the individual's immediate custody and control. The consent to go beyond this limitation, to expand the search is usually considered by the courts to be an involuntary act by the individual. Some courts hold that what seems to be consent by a person under arrest if often intended to convince the officials not to search, and so is not consent at all. For instance: "I have no stuff in my apartment and you are welcome to search the whole place". Such a consent has been found to be "false bravado" and invalid. Therefore consent searches generally are not to be employed where a person is arrested. The following are examples when and when not to use a consent search following an arrest.

1. A confession of guilt which precedes a consent to search tends to show that the consent was voluntary and will probably be acceptable to the court.

2. A denial of guilt at the time of arrest or interrogation accompanied by a consent to

search will generally make the consent invalid.

The courts have said that no sane man would deny his guilt and, at the same time, voluntarily consent to a search during which contraband will certainly be discovered. Therefore, do not use a consent search when the person denies guilt.

In those instances where consent searches are utilized by an agent, he must give the Miranda Warnings. Even when a person is under arrest he must be given these warnings again and they are also to be given when the individual is not under arrest.

A consent to search is only valid as long as the individual allows the consent to remain in force. If a person gives his consent in writing and before or during the search, orally withdraws that consent, the agent will not conduct or continue to conduct the search as he has no continuing right to do so. However, if an agent is conducting a search and consent is withdrawn, but the agent then has sufficient probable cause, based on his observations, to sustain an arrest, he should arrest the individual and conduct search incidental to the arrest which is normally limited to the accused's immediate area of control.

Under a consent to search, all property removed from the premises or from the accused should be inventoried and the individual given a receipt for such property whether or not it is personal property or contraband. All property seized will also be reported on a BND-7.

10. 5 C.F.R. 772.305

"(c) Hearing procedures. (1) An appellant is entitled to appear at the hearing on his appeal personally or through or accompanied by his representative. The agency is also entitled to participate in the hearing.

the appearance of eight witnesses at the hearing before the Assistant Hearing Examiner. He later presented a list of reasons why he wanted these eight persons produced. In a letter dated June 28, 1971, Mr. Tinkler, the Assistant Hearing Examiner, forwarded the request and reasons to B.N.D.D. Mr. Coon for B.N.D.D. refused the request citing administrative impracticality in a letter dated July 2, 1971.

Mr. Coon wrote in part:

"Now he is attempting to obtain a 'de novo' hearing [11] and, in so doing, introduce new testimony from persons having no direct knowledge of his offense. Since the Civil Service Commission hearing is a review of the existing record for procedure and adequacy, I can see no need to provide the persons requested. That being the case, we feel that it would be administratively impractical to comply with this request."

Plaintiff's request for witnesses and reasons are set out in the margin.[12] Even if we were to accept Mr. Coon's reasoning for a moment, it would be clear that Mr. Coward and Mr. Karadimos should have been produced to testify as to the procedure used in the B.N.D.D. proceedings.

But the Court does not accept Mr. Coon's reasoning. He was pandering the use of administrative impracticality to suit his belief that there was no need

Both parties are entitled to produce witnesses. The Commission is not authorized to subpoena witnesses."

"(2)" in part recites: "An agency shall make its employees available as witnesses at the hearing when (i) requested by the Commission after consideration of a request by the appellant or the agency and (ii) it is administratively practicable to comply with the request of the Commission."

11. 5 U.S.C. § 7701, allowing appeals of preference eligibles to the Commission has been held to require a de novo hearing, McTiernan v. Gronouski, 337 F.2d 31 (2d Cir. 1964).

12. 1. *John E. Ingersoll*: to be questioned as to who actually made the decision to remove Mr. Brown; as to whether or not he has condoned and praised agents for making searches similar to the search for which Mr. Brown was discharged; and as to whether the training and education of agents advocates such searches. Mr. Ingersoll is also requested to produce and bring to the hearing the agency's files and records relating to disciplinary action taken by the agency against employees for making searches, if any.
2. *N. B. Coon*: to testify relative to whether or not he has condoned and praised agents for making similar searches as the one involving Mr. Brown's dismissal; whether or not the training and education of agents advocates the making of such searches. Also, Mr. Coon is requested to produce and bring with him the agency's files and records relating to disciplinary action taken by the agency against employees making such searches, if any.

3. *Alwin C. Coward*: to testify regarding such facts as to whether or not he rode down from Washington, D. C. on the airplane with the agency representative prior to conducting the agency hearing; whether or not he discussed the case with agency officials prior to conducting the agency hearing; and whether or not he was shown documents and statements made by representatives of the agency which would be detrimental to appellant's case, prior to conducting the agency hearing.
4. *Wayland L. Speer*: to testify as to whether or not as a former supervisor of Mr. Brown he did not incur and condone such searches as that for which Mr. Brown was discharged; and as to whether or not Mr. Brown was an exemplary employee.
5. *James R. Bland*: to testify as to the same matters covered in the testimony of Mr. Speer.
6. *Harold D. Gates*: to testify as to previous visits of Mr. Brown to the Debonair Club; also as to the physical and mental condition of Mr. Brown prior to the incident; and as to policies and procedures of the Dallas Region of BNDD.
7. *James F. Hunter*: to testify as to the same matters to be covered in Mr. Gates' testimony.
8. *Charles J. Karadimos*: to testify as to whether or not he was personally prejudiced against Mr. Brown and wanted to fire him on his own; and whether or not he had expressly authorized searches more detrimental to the Bureau than the one made by Mr. Brown; whether he has communicated with appeals officials outside the record and interfered with the appeals process.

for the witnesses. By doing so, he was imposing his view of the case upon Plaintiff by fiat and was preventing Plaintiff from presenting his case.

Defendants, now on review, have come up with the reasoning that these witnesses were expert witnesses and therefore did not have to be produced by B. N.D.D. An excellent definition of expert witness is: "Witnesses who have acquired ability to deduce correct inferences from hypothetically stated facts or from facts involving scientific or technical knowledge." [13] Plaintiff did not request the eight witnesses in order to put a hypothetical question to them, he requested that they be produced so that they could make statements of fact out of their personal knowledge in response to particularized questions asked of them by Plaintiff's counsel.

■ Clearly, there was never a showing of any administrative inconvenience and the witnesses should have been produced at the hearing before the Assistant Hearing Examiner. It is basic due process that the Government cannot set up regulations and then disregard them.[14]

■ At the hearing before Mr. Tinkler, Assistant Hearing Examiner for the Commission, a court reporter was excluded from the hearing by Mr. Tinkler. Plaintiff had brought the court reporter at his own expense so that he could have a verbatim record of the proceeding. The question is whether or not the Assistant Hearing Examiner had the power and authority to exclude the court reporter from the hearing.

The recent case of Fitzgerald v. Hampton [15] is persuasive in its reasoning and its authority.

The reasoning in simplified form is: (1) the purpose of a closed hearing is to protect the employee, (2) public hearings are part of our heritage and a mechanism to insure our fundamental rights, (3) therefore the employee can waive the closed hearing and demand a public hearing. The Court agrees with the D.C. Circuit when it said "that due process requires the . . . hearing be open to the press and public." [16] As a result of this, Plaintiff had the right to waive privacy and expose the proceedings to the world without the Assistant Hearing Examiner excluding any person purely on the ground of privacy.

■■ Mr. Tinkler's summary of the Commission hearing shows that Mr. Lenck, the prosecutor for B.N.D.D. at both hearings testified, in the words of the Assistant Hearing Examiner, "Mr. Lenck admitted that he flew down from Washington to Dallas on the airplane with Mr. Coward (the Hearing Examiner in the agency hearing) prior to the agency hearing and that they did discuss the case on the way down; that they stayed in the same hotel, and again discussed the case in the car on the way back to the airport for their return to Washington." The record shows that both Mr. Lenck and Mr. Coward are licensed attorneys. They are charged with the knowledge that such conduct is improper in an adversary situation. In fact 5 U.S.C. § 554(d) prohibits the Hearing Examiner from engaging in such conduct.[17] The impartial conduct of a judicial or quasi-judicial proceeding is one of the most fundamental rights of due process that we have.

Plaintiff has been denied procedural due process in at least these three instances. He has made other contentions which may also be true but the lack of a full transcript of the Commission hearing makes it unclear as to just what occurred. But the issues discussed above

13. City of Chicago v. Lehmann, 262 Ill. 468, 104 N.E. 829, 830, cited in Black's Law Dictionary, 4th Ed., under Expert Witness.

14. *McTiernan*, supra.

15. 152 U.S.App.D.C. 1, 467 F.2d 755 (1972); mandate stayed, 409 U.S. 1055, 93 S.Ct. 549, 34 L.Ed.2d 509 (1972); stay vacated on motion of the Solicitor General, 409 U.S. 1100, 93 S.Ct. 888, 34 L.Ed.2d 682 (1973).

16. ibid, p. 766.

17. Camero v. United States, 375 F.2d 777, 179 Ct.Cl. 520 (1967).

are more than enough to dispose of this case.

Plaintiff's removal was unlawful as he was not afforded due process, substantive and procedural, and the actions of the Bureau of Narcotics and Dangerous Drugs and the Civil Service Commission were arbitrary and capricious. Plaintiff shall be reinstated to his former position with back pay including all rights, benefits and step increases that he would have been entitled to but for this removal. Plaintiff shall be granted his costs. Plaintiff shall submit a proposed judgment to the Court, preferably with Defendants' approval as to form.