**SKOKIE FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK BOARD and Talman Federal Savings and Loan Association of Chicago, Defendants.**

**No. 73 C 2677.**

United States District Court,
N. D. Illinois, E. D.

June 16, 1975.

Thomas J. Houser, Thomas H. Morsch, Tomas M. Russell, Sidley & Austin, Chicago, Ill., for plaintiff.

Charles E. Allen, Paul E. McGraw, Daniel J. Goldberg, Harold B. Shore, Harvey Simon and Ernest M. Cohen, Gen Counsel, Federal Home Loan Bank Board, Washington, D. C., for Fed. Home Loan Bank.

Jerome P. Croke, Chicago, Ill., Roger C. Wiegand, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Irwin Zatz, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Talman Fed. Savings & Loan Ass'n.

## MEMORANDUM OPINION

DECKER, District Judge.

Pursuant to its authority under 12 U.S.C. § 1461 *et seq.*, the Federal Home Loan Bank Board ("Board") made two decisions of extraordinary economic significance to federally insured savings and loan associations in Illinois, and as might be expected, a flood of litigation ensued. The first decision was generally to allow these associations to establish *de novo* branches, a practice denied by state law to state incorporated banks.[1] The second decision was to grant applications made by specific savings and loan associations to open branches at various particular sites. Most of the questions raised by the litigation were resolved in the extensive opinion of my colleague, Judge Will, reported as *Lyons Savings &*

1. Ill.Rev.Stat. ch. 16½ § 106.

*Loan Ass'n v. Federal Home Loan Bank Bd.*, 377 F.Supp. 11 (N.D.Ill.1974). That opinion, which consolidated eight cases, addressed itself primarily to the constitutionality and the legal validity of the Board's first decision.

In Count IV of the present amended complaint, plaintiff Skokie Federal Savings & Loan Association ("Skokie") alleges a course of conduct between the defendant Board and the defendant Talman Federal Savings and Loan Association ("Talman"), through various persons, which allegedly unconstitutionally and otherwise illegally tainted with bias the decision of the Board to allow Talman to open a branch office at the Old Orchard Shopping Center in Skokie, Illinois. The other counts of the amended complaint are no longer the subject of contest.

The defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, and plaintiff has opposed. As one of the benefits of the extensive discovery carried out in this case, each side has supplied the court with documents in support of its position. After careful review of these, and the legal arguments which have been presented in writing, the court finds that there are no material facts in dispute which could entitle plaintiff to any relief, and thus the court will grant summary judgment in favor of the defendants.

*Facts*

Most of the documents, including depositions, supplied by the plaintiff are irrelevant to its claim for relief; these materials are directed to the prospect that the Board's initial decision to allow associations to have branch offices at all in Illinois was improperly reached. That decision is not here challenged; Skokie was as much the beneficiary as Talman, and all the other federal savings and loan associations in Illinois. If Talman *arguendo* made an impermissible liaison in the course of the Board's first decision, Skokie has not demonstrated the continuation of such a liaison sufficiently to withstand defendants' motions. Moreover, the Board members who were responsible for the first decision, Preston Martin, Carl Kamp, Jr., and Thomas Clarke, did not make the decision allocating to Talman the Old Orchard site. Two entirely new members, Thomas Bomar and Grady Perry, had replaced these three, and defendants have submitted material showing that it was these two who made the Talman decision.[2] Given the foregoing perspective, the materials adduced by Skokie will be highlighted.[3]

The supposed improprieties between the Board and Talman all took place before the January 12, 1973, announcement by the Board that, under a change in policy, it would henceforth permit savings and loan associations to have *de novo* branches in Illinois. First, a communication took place between Henry Carrington, then both head of the Board's Office of Industrial Development and Secretary to the Board, and Clark Sutton, ultimately a consultant retained by Talman. Carrington advised Sutton, in December, 1971, of the feasibility of applying for a branch office of a savings and loan association in West Virginia, a state which had a nonbranching law similar to that in Illinois. Sutton was not at that time working on any Talman application. On Carrington's advice, Sutton had included in his West Virginia application letters from the Federal Reserve and the Federal Insurance Deposit Corporation which indicated the existence of affiliated banks in West Virginia. Sutton's theory (whether or not supplied by Carrington) was that the

2. A major part of defendants' support for their motions is a memorandum from Chairman Bomar to staff members, dated September 9, 1973.

3. Another issue in these motions is whether, as a matter of fact, plaintiff had early enough knowledge of the alleged bias to make the present amended complaint untimely. The court finds this matter in sufficient dispute to assume, for purposes of this motion, that the amended complaint is timely.

demonstration of *de facto* branch banking in a state might persuade the Board to allow *de novo* branch offices there for savings and loan associations. Carrington stood out in this respect for Sutton since Carrington had staunchly advocated the Board's allowance of *de novo* branch offices, as a matter of policy, in a third state, Florida.

A subsequent communication took place between Talman vice president Jerome Croke and then Board Chairman Martin, in July, 1972, in which Croke explained that *de facto* branch banking was indeed present in the State of Illinois. Although Talman was then submitting applications for a *de novo* branch and for the Old Orchard site, there is no indication that Talman was then (or logically, could ever be) in an adversary position to plaintiff or any other federal savings and loan association vis à vis the Board's decision to allow savings and loan associations to establish *de novo* branches.

Because of the Board's then pending policy against *de novo* branches in Illinois, the Talman application was returned at least once without being processed. Talman, of course, wanted the application to be processed (and granted), and toward that end, plaintiff maintains, Talman counsel Douglas Whitlock spoke with Board general counsel Charles Allen "threatening" to bring an action in mandamus. This conversation, in November, 1972, purportedly also included a demand that the application be accepted by January 15, 1973, when Talman would have to either forfeit earnest money of $50,000 on the Old Orchard site, or else commit itself to the $735,000 purchase. The mandamus action was in fact filed (No. 2313–72, District Court, District of Columbia). Plaintiff alleges that Talman agreed not to prosecute the suit in exchange for the Board's promise that the Talman application

would eventually be granted. There is, however, no documentation whatsoever of this agreement—it is a pure assertion, and can function as no more than a specifically drafted paragraph in a complaint. There is documentation, however, that the Board announced its policy change before the January 15th date because of Talman's supposed real estate predicament, and also that Talman had, at another time, attempted to exert pressure on the Board through the threat of publicity and through litigation.

Very shortly after the alleged conversation between Whitlock and Sutton, Talman's application was returned unprocessed by the Chicago office of the Board, and Talman, through its vice president Albert Brody, telegraphed the Board, making reference to assurances of Allen that "favorable actions would be taken on Talman's application."

On April 4, 1973, oral argument on the Talman application was heard, at which counsel for sixteen protesting associations and banks were present. Plaintiff maintains that the decision to grant Talman the Old Orchard site was already determined in the agreement with Allen. However, no claim is raised here that if such an agreement ever existed, it manifested itself through a restriction of the information gathering process that took place at the oral argument or anywhere else.[4] After the two new Board members took office, in June, 1973, they continued the factual inquiry regarding the Talman application, with the final Board decision emerging as a Board resolution on October 5, 1973.

*Law Regarding Bias in Administrative Processes*

Although plaintiff initially alleges both a violation of its due process rights under the Constitution and a violation of the fairness required by the Administrative Procedure Act, those two cri-

---

4. The opinion letter which the Board circulated along with the resolution announcing its decision to allow Talman's chosen site for a branch office indicates that Skokie had raised related objections to the Board, namely that the procedures had been inadequate to afford due process. There is no indication that Skokie at that time alleged the inadequacy was due to any bias in favor of Talman.

teria, insofar as bias is concerned, appear to be the same.[5] *Cf. Hoffmann-LaRoche, Inc. v. Kleindienst*, 478 F.2d 1, 12 (3d Cir. 1973). Plaintiff has argued the existence of a "personal" bias, for whatever reason, which existed at the Board on several levels, which would have the effect of a tendency on the part of the Board to make decisions in favor of Talman regardless of the credible relevant information provided by any party with a contrary interest. *See* Davis, Administrative Law Treatise § 12.02 (1958). This type of bias must be distinguished from situations which frequently arise in connection with administrative bodies, in which a decision-maker makes a policy statement prior to a decision which would favor a particular outcome. *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 701–703, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *accord, Skelly Oil Company v. Federal Power Commission*, 375 F.2d 6, 17–18 (10th Cir. 1967), *aff'd in part, rev'd in part, on other grounds, sub nom Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). As Professor Davis has pointed out, "Bias in the sense of crystallized point of view about issues of law or policy is almost universally deemed no ground for disqualification" of a decision-maker. Davis, *supra*, § 12.01. Thus, the fact that members of the Board's staff may have favored a policy of generally allowing *de novo* branches can have no bearing on this case.

There has been no indication from plaintiff's materials that the decision-makers, Bomar and Perry, shared the personal bias which arguably attached to some of their predecessors, or perhaps to certain members of their staff. Plaintiff strenuously urges that even the *appearance* of impropriety should justify the vacating of an administrative decision. Whenever a large organization makes a decision, there is always the possibility that some person, remote from the decision itself, may have engaged in improper conduct or communication. Precedent does not require the impractical result that *every* such possibility be sufficient to invalidate an administrative decision. Where courts have found the appearance of impropriety to be decisive, their chief concern has been with situations which have more than potential impact on the persons making decisions, particularly where one person takes on the inconsistent roles of prosecuting and decision-making or where a bias is developed which is peculiar to the very case being decided. *In Re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), (judge should not have assumed prosecutorial and judicial function in same case); *American Cyanamid Company v. Federal Trade Commission*, 363 F.2d 757 (6th Cir. 1966), (commissioner found to have developed strong factual bias on same case when he previously worked with an investigative Senate subcommittee); *Amos Treat & Co. v. Securities and Exchange Commission*, 306 F.2d 260, 266 (D.D.Cir. 1962), (commissioner should not have participated in decision case whose investigation be initiated); *Air Transport Ass'n of America v. Hernandez*, 264 F.Supp. 227 (D.C.C.1967), (Equal Employment Opportunity Commissioner who was about to resign and had already vociferously promulgated her alignment with women's liberation organization should not have voted in sex discrimination charge); *see also Taylor v. New York City Transit Authority*, 433 F.2d 655, 670 (2d Cir. 1970).

To the extent that the process of administrative fact finding may be impugned by a biased hearing examiner, the impact of personal bias (or its appearance) on the decision may be simi-

---

5. The court finds no provision in the Administrative Procedure Act which specifically relates to Count IV of the amended complaint. We do not therefore pause to consider precisely how the Act applies to the decision granting Talman the Old Orchard site for a branch office. *Cf. Lyons Savings & Loan Ass'n. v. Federal Home Loan Bank Bd., supra*, at 24.

larly fatal. *Inland Steel Co. v. National Labor Relations Board,* 109 F.2d 9 (7th Cir. 1940). In other respects, impact on a hearing examiner *may* be given the same treatment as that on a decision-maker. *Brown v. U. S.,* 377 F.Supp. 530, 537 (N.D.Tex.1974), (Bureau of Narcotics "prosecutor" in Civil Service Commission review of employee's discharge stayed in same hotel and communicated with the hearing examiner the night before the hearing). However, the approach is less compelling where the decision makers need not rely on the recommendation of the examiner. *International Telephone and Telegraph Co. v. I.B.E.W.,* 419 U.S. 428, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975) (construing Administrative Procedure Act); *DeLucia v. Immigration and Naturalization Service,* 370 F.2d 305 (7th Cir. 1966), *cert. denied,* 386 U.S. 912, 87 S.Ct. 861, 17 L.Ed.2d 784 (1967); *Standard Distributors, Inc. v. Federal Trade Commission,* 211 F.2d 7, 11–12 (2d Cir. 1954); *National Labor Relations Board v. Air Associates, Inc.,* 121 F.2d 586, 590 (2d Cir. 1941); *see Fidelity Financial Corp. v. Federal Savings & Loan Insurance Corp.,* 359 F.Supp. 324 (N.D.Cal.1973), (admittedly biased investigator no longer worked for administrative body, and facts supporting its decision had been *independently* verified).

■ Where the actual decision-makers are not shown to be affected by the bias, overturning an administrative decision would be unjustified by a court. *Compare Fidelity Financial Corp. v. Federal Savings & Loan Insurance Corp., supra, with Camero v. United States,* 375 F.2d 777 (U.S.Ct. of Claims 1967), (Adversary's attorney helped to draft seemingly neutral intra-office legal memorandum on case), and *Berkshire Employees Ass'n etc. v. National Labor Relations Board,* 121 F.2d 235, 239 (3d Cir. 1941). This focus applies with particularity to improper communications. *See Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 269 F.2d 221 (1959), *cert. denied*

376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964). The impact simply cannot occur when the improper conduct affects persons who are no longer decision-makers, *Simard v. Board of Education of Town of Groton,* 473 F.2d 988 (2d Cir. 1973), or persons who have not been demonstrated to influence the decision being challenged.

*Summary Judgment*

■ For pleading purposes, the materials submitted by plaintiff can be read to infer something more than cooperation between certain staff members of the Board and agents of Talman on issues regarding the permissibility of *de novo* branches in Illinois. However, that is where the reading most favorable to the plaintiff must stop. Skokie makes no complaint as to the present Board members. Its opposition to defendants' motions for summary judgment cannot successfully rely on the completely unsupported potential that the extant Board staff influenced the October 5, 1973, decision, through some residuum of bias. Neither is Skokie entitled to the opportunity of discovering new information at trial which its extensive discovery has not at all suggested. Such an opportunity would constitute a misuse of the trial process. *First National Bank v. Cities Service,* 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Once the movant defendants brought forth material (admittedly meager in this case) which unequivocally supports their position that the decision granting Talman the Old Orchard site was the result of a continuing inquiry by the new Board, it remained for the plaintiff to show a dispute as to the bias in the October 5, 1973, decision, either by showing improprieties by the new Board, or by setting forth specific facts from which it could be inferred that the earlier communications created a bias which had an impact on that later decision. *See Sweet v. Childs,* 507 F.2d 675, 679 (5th Cir. 1975); *Rose v. Bridgeport Brass Company,* 487 F.2d 804 (7th Cir. 1973);

*Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir. 1972). The court reaches this decision after construing all documents submitted in the light most favorable to the opponent of the motion, as required by *International Ass'n of M. & A. W., Dist. No. 8 v. J. L. Clark Co.,* 471 F.2d 694, 697 (7th Cir. 1972).

*Conclusion*

For the foregoing reasons, the defendants' motions for summary judgment as to Count IV of plaintiff's amended complaint are hereby granted.