**UNITED STATES of America ex rel. Birchel Leonard CARSON, Petitioner,**

v.

**Larry TAYLOR, Warden, Metropolitan Correctional Center and John T. Connally, Chief Probation Officer, Southern District of New York, Respondents.**

No. 75 Civ. 4398.

United States District Court, S. D. New York.

Nov. 14, 1975.

As Amended Dec. 4, 1975.

Birchel Leonard Carson pro se.

Thomas J. Cahill, U. S. Atty., S.D.N.Y., New York City, for respondents; Alan Levine, Asst. U. S. Atty., of counsel.

## OPINION

FRANKEL, District Judge.

The institution of parole has been a lively subject of debate and litigation in the last few years. Responding to the mounting criticisms, the United States Board of Parole, under an energetic and creative Chairman, has lately fashioned a number of substantial improvements in its standards and procedures. But progress is not a straight line. The case now before this court reveals a regrettable course of careless, sometimes callous disregard by subordinate parole officials of basic procedural rights. The petitioner, compulsorily released on parole earlier this year, has spent over four months in renewed confinement, having been subjected throughout to a series of grave procedural denials. He seeks, and is entitled to, release on the writ of habeas corpus.

### I.

The petitioner was sentenced on June 16, 1972, to a term of five years in prison for violation of 18 U.S.C. §§ 371, 2314 (conspiracy and interstate transportation of forged securities). He was not released on parole under the discretionary authority given to the Board of Parole to order such release after service of one-third of the sentence. See 18 U.S.C. §§ 4202 and 4203. Instead, having earned the requisite amount of good time, during a prison career that included substantial amounts of college course work both inside and outside prison walls, he was mandatorily released on January 30, 1975, "at the expiration of

his term of sentence less the time deducted for good conduct." 18 U.S.C. § 4163. From the date of his release, he was under the law "deemed as if released on parole until the expiration of the maximum term * * * for which he was sentenced less one hundred and eighty days." 18 U.S.C. § 4164.

It appears to be undisputed that petitioner has some experience in the entertainment industry, specifically in booking and managing popular music groups. In addition, his college work during confinement included training in computer programming. Having been released in this District, where he had been convicted, and subjected to parole supervision here, he was failing in his efforts to obtain and keep gainful employment. On the other hand, according to his own and other uncontradicted evidence, he had friends who would help him and employment opportunities in Biloxi, Mississippi. Specifically, there appeared to be available there a site, licensing, supportive collaborators, and financing for a discotheque that would serve a tourist trade.

According to petitioner, being unable to reach his parole officer by telephone and not having received his official monthly report form, he sent the required information in a letter to his parole officer. In the same letter, he reported that he was traveling to Mississippi to pursue employment possibilities there. He stated that he would be residing with a friend, Mr. Pat Gill, at 903 Caillavet Street, Biloxi, Mississippi, and gave a telephone number where he could be reached. The parole officer denies receiving this communication. There was some discussion and speculation at the revocation hearing, not critical now, of the fact that when a violator warrant was later issued against petitioner, F.B.I. agents came straight to Mr. Gill's home where petitioner was found and taken into custody.

Another disquieting circumstance, minor in the array of such things that come ultimately to characterize this case, arises from the parole officer's testimony purporting to discredit petitioner's assertion that he had not received the prescribed form for his supervision report. It had been duly sent, said the parole officer, and returned, as undeliverable. When it was shown, however, that it had been addressed under a former alias no longer used by petitioner, either for parole supervision or for the records of the hotel at which he was living, the parole officer merely observed: "Well, I guess you've got a point there."

On July 2, 1975, a warrant was issued for the arrest of petitioner as an alleged parole violator. The application for the warrant alleged two grounds:

"1. *FAILURE TO SUBMIT SUPERVISION REPORT*

As of 6/25/75 Mr. Carson has failed to submit his supervision reports for the month of May 1975, according to USPO Berger's report of 6/25/75.

"2. *FAILURE TO REPORT CHANGE IN RESIDENCE*

On or about 6/1/75 Mr. Carson left his approved residence at the Hotel Empire, 44 West 63rd Street, New York City, N. Y. has failed to report his change in residence to his USPO, according to USPO Berger's report of 6/25/75. Mr. Carson's current whereabouts is unknown."

Petitioner was apprehended on July 3, 1975, and lodged at the Harrison County Jail in Gulfport, Mississippi. On July 15, 1975, he was given a "Preliminary Parole Revocation Hearing" in Gulfport before a probation official there. According to petitioner, he asked the official to request petitioner's New York parole officer, who had applied for the violator warrant, to appear at the hearing so that petitioner might question him. The charging officer did not appear, nor is there any indication whether he was ever asked to or of any reason for his non-appearance. Following this preliminary "hearing," petitioner requested that his formal revocation hearing be

held in Mississippi, where the people he had come to live and work with could testify in his behalf. The request was neither granted nor favored with a response.

On August 14, 1975, petitioner was brought to this District and confined in the Metropolitan Correctional Center adjoining this Courthouse. He was to remain there for over a month before a Board of Parole hearing came to be held on whether his parole should be revoked. In September he succeeded in retaining counsel, who initiated the instant proceeding. As begun by a proposed order to show cause presented on September 8, 1975, the petition sought release on the ground that the hearing had been delayed for an impermissibly long time, during all of which petitioner had remained in jail. When the order came to be presented, however, the court was informed that the hearing was now scheduled and set to begin within a few days, on September 24, 1975. In the circumstances the court concluded that there was no immediate occasion to consider habeas relief, see *Davis v. United States*, 288 F.Supp. 180 (W.D.Mo.1968), and declined to sign the order. As will appear below, the delay of the hearing has never been acceptably explained.

The revocation hearing that ensued has been preserved on cassette tapes and a reasonable approximation in typewritten form of what appears on those tapes. The court has read and listened. It may be said that these are not among the records that display us at our best in the administration of justice. The hearing officer in charge repeatedly, and understandably, makes the point that parole revocation hearings are not subject to the procedural formalities of the courtroom. Driving the point home, the hearing record is a vivid display of how casual, unstructured, disorganized, and unfair a proceeding may be thought by some to constitute all the process that is due in a hearing to revoke parole.

In the questioning of petitioner and presumptively, as is now conceded, in ruling against him at the end, the hearing officer relied upon documents that were withheld from the petitioner. The Government has handed these papers to the court in a sealed envelope, still proclaiming its right to keep them concealed from the petitioner. Responding to the question whether it comports with fundamental fairness to rely upon such secret evidence in reaching a decision to re-imprison a man, government counsel assures us this is all right. The explanation given is that parole revocation, as revokees must be comforted to hear, is "not an adversarial process." The foundation for that proposition, and for its specific consequences in this case, is said to be *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). For reasons elaborated later, the court rejects this argument. As will also appear, the unfairness of the hearing in this respect is by no means all that vitiates the decision to revoke petitioner's status as a mandatory releasee.

At the conclusion of the hearing, the hearing officers retired for a period, then returned and announced that petitioner had been found a parole violator and that the sanction was to be his reconfinement. These determinations were stated briefly on the record and then, two weeks later, repeated in substantially the same laconic terms in a written "Notice of Action." As recorded in the latter document, the decision was that petitioner had committed both of the violations charged in the warrant application plus another violation not so charged, but now described as "admitted."[1] As to the "REASONS"

---

1. The "Notice of Action," in its full statement on this first aspect, said:
 "Revoke mandatory release.
 REASONS:
 Violation Charge #1: Failure to submit supervision reports. Basis: You failed to submit supervision reports as reported by your parole officer in his letter dated June 25, 1975. Violation Charge #2: Failure to report change of residence. Basis: You failed to report your change of residence as reported in Mr. Berger's

for the dread sanction, the written decision said:

"Your release at this time would depreciate the seriousness of your mandatory release process. It does not appear to be a reasonable probability at this time that you would conform to the conditions of mandatory release in that you failed to submit your supervision report for the month of May, 1975, failed to report change in residence to your parole officer and admitted to the panel that you left the district without permission."

Having had his long-delayed hearing, being informed of the adverse decision, but having evidently exhausted the wherewithal to continue employing counsel, petitioner filed a supplemental petition *pro se*, seeking to preserve his earlier grievances about the delays but concentrating now upon asserted flaws in the hearing and the decision to reincarcerate him. Certain delays caused by the court and government counsel have prolonged an extended period of confinement that is now found to be fundamentally unsupportable. Having received finally all the necessary materials for decision, and after hearing petitioner and government counsel on November 11, 1975, the court records the reasons why the writ should and will be granted.

## II.

■ Had there been a fair hearing, the court would probably conclude that there is sufficient evidence in the record to support the Board's finding that petitioner violated certain conditions of his mandatory release. But the hearing was grossly unfair in vital respects. Moreover, the finding of violations (relatively minor ones in this case) is only a first step. The second, and more cru-

cial, determination is whether the violations warrant returning the parolee to prison. Due process must attend both stages of the inquiry. See, e. g., *Morrissey v. Brewer, supra; Sutherland v. District of Columbia Board of Parole,* 366 F.Supp. 270 (D.D.C.1973). As will become apparent in the discussion below, the Board's procedures fell woefully shy of due process requirements at nearly every juncture.

■ On grounds already adumbrated in part, there is in this record a cumulation of actions by parole officials made up in excess measure of indifference, unfairness, arbitrariness, and unexplained punitiveness. At least one or two of the departures from decent procedure (perhaps most notably, the insistent reliance upon secret evidence for both the findings of violation and the designation of the harshest possible penalty) would probably be sufficient in themselves to vitiate the decree of imprisonment against which the writ is sought. But whether that is so or not, the long course of official conduct, with its repeated instances of impropriety, compels this result. The simplest and most expeditious way to account for this conclusion is to summarize in more or less chronological order rather than supposed order of importance the offensive incidents.

1. The delay of almost three months before petitioner was given a hearing in which he had any opportunity to confront his accusers—during all of which time he remained in prison though the violations charged were surely of the least disturbing and dangerous species —was inexcusable. At the outset, nobody deigned to answer when petitioner asked that his parole officer appear at his preliminary interview and for a local

letter of June 25, 1975. Other admitted charges: Leaving the district without permission. Basis: You admitted to the panel at the time of the hearing that you had gone to Canada, and had not received the permission of your parole officer to travel to that country."

The last portion, "Other admitted charges," did not relate to any "charges" in any pertinent sense. See text of violator warrant quoted earlier.

revocation hearing in Mississippi. While some eight long weeks passed and he pressed repeatedly to be heard, nobody explained the delay or bothered to say when the hearing might happen. Finally, on August 21, 1975, he was sent a letter saying he would have a hearing over a month later. Long after that hearing had finally been held, the court and petitioner were given this account by the Northeast Regional Director as supposed justification for the delay:

"* * * Mr. Carson arrived at the New York Metropolitan Detention Center on August 15, 1975. The Northeast Region learned of his presence at that facility on August 20, 1975, through a teletype sent by the U.S. Marshal for the Southern District of New York. Although, as mentioned above, hearings were conducted at the Metropolitan Detention Center on August 27, 1975, Mr. Carson's case was not scheduled for that time. Due to his recent arrival in New York, and the late notification by the U.S. Marshal, Mr. Carson was informed by Mr. John F. Sicoli, Senior Analyst, by letter, dated August 21, 1975, that his case would be heard on September 24, 1975, the next occassion [sic] that an examiner panel would conduct hearings at the Metropolitan Detention Center. This was done to permit Mr. Carson sufficient time to prepare for the revocation hearing by securing the assistance of counsel and requesting the attendance of both adverse and voluntary witnesses to testify regarding the alleged violations."[2]

█ That is not an impressive, or even an excessively candid, explanation. The Board of Parole knows that we impose, even upon the States under the due process clause, a duty to hold a prompt preliminary hearing, with an opportunity to question persons who have given adverse information, to determine whether there is probable cause to believe that the parolee violated any of the conditions of his parole. *Morrissey v. Brewer*, 408 U.S. 471, 485–87, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). If probable cause is determined to exist, the Board must then hold a more formal hearing—again as promptly as possible —to determine whether the parolee's conditional freedom must be ended. Id. at 487–89, 92 S.Ct. 2593.

Petitioner's preliminary "hearing" was held on July 15, 1975, before a probation officer in Mississippi. Petitioner's request to have his New York parole officer appear for questioning in his presence, as required by *Morrissey*, was apparently ignored, or in any event denied without explanation. Both before and after his preliminary interview, petitioner repeatedly asked that his formal revocation hearing be held in Mississippi. Instead, for undisclosed reasons of its own, the Board of Parole decided to ship petitioner back to New York, with intermediate sojourns at several local and federal jails. When he finally arrived in New York on August 14, 1975, petitioner was held in the Manhattan Correctional Center. His revocation hearing was not held until September 24, 1975.

The delays between (1) preliminary interview and arrival in New York and (2) his arrival here and the revocation hearing, were unreasonable. The latter delay is not made less objectionable by the solicitous observation that the period of over a month after August 21 was "to permit Mr. Carson sufficient time to prepare * * *."

█ We may assume, *arguendo*, that the unjustified delay would now be of no help to petitioner if this were a case in which finally "a fair hearing [was] held which in all other respects [satisfied] the requirements of the statute." *United States ex rel. Buono v. Kenton*, 287 F.2d 534, 536 (2d Cir. 1961), and the Constitution. But this is not such a case. As we turn to other defects in the proceedings, the unwarranted delay

2. Affidavit of Curtis C. Crawford sworn October 28, 1975, pp. 4–5.

serves at least to set the scene. It is a bad scene; it does not improve as it is traced further.[3]

■ 2. It was conceded in oral argument, and it is clear from the record before us in any event, that the hearing examiners relied upon undisclosed evidence in deciding that petitioner's parole should be revoked. This was, in the circumstances of this case, a denial of due process. *Morrissey v. Brewer, supra.*

■ The petitioner had a right under *Morrissey* to "disclosure * * * of evidence against him * * *." Id. at 489, 92 S.Ct. 2593. He had "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically [found] good cause for not allowing confrontation) * * *." Id. These rights were plainly violated. We have been invited to inspect *in camera* the reports of informants and other adverse documents withheld from petitioner at the hearing. These papers are filled with patently hurtful evidence that must be supposed to underlie the opaque decision (see *infra*) that petitioner should suffer recommitment. In asking *the court* to say now that the nondisclosures were justified, the Government slips into at least two errors. First, if it were for us to say, we perceive no evident justification for the secrecy. Second, and more important, it was for the hearing officers to declare in the first instance whether and why they believed

there was "good cause" for the concealment. This was not done. In addition to the sufficient authority of *Morrissey* for invalidating what was done here, see *Birzon v. King,* 469 F.2d 1241, 1243–45 (2d Cir. 1972).

■ 3. The Board of Parole has itself demanded by regulation more than the petitioner was given in this case. The Board requires its hearing officers, as it should, to (1) "request the attendance of persons [at the revocation hearing] who have given statements upon which revocations may be based * * * unless the presiding hearing officer * * * finds good cause for their non-attendance" and (2) disclose "all evidence upon which the finding of violation may be based." 28 C.F.R. §§ 2.56(d) and (e). It is perfectly clear from the withheld documents that the regulations were not obeyed. Some obviously adverse and material documents were relied upon by the hearing examiners in reaching their decision; others, equally adverse and material, may have been relied upon. None of the documents was given to the petitioner. None of the informants supplying the evidence embodied in the documents was produced for cross-examination. No reason was given for their absence. What little substance from a few of the documents was revealed to petitioner at the hearing did not give him enough facts to permit a meaningful rebuttal.[4]

3. The delay is also important in disposing of the Government's complaint that petitioner failed to exhaust his right of appeal to the Regional Director of the Parole Board. 28 C.F.R. § 2.25. It is significant, to begin with, that this habeas proceeding began as an attack upon the undue delay while that delay was happening. "The proper time to object to an unreasonable delay in granting a hearing is during that unreasonable delay." *United States ex rel. Buono v. Kenton, supra* at 536. The court respected the administrative process, possibly to excess, by staying its hand while the revocation hearing went forward far more tardily than it should have. Where, as is now found, the long wait brought forth a proceeding that violates minimum standards of the Constitution and the agency's own regulations, and where the

time for an agency appeal has passed during the pendency of the court's proceeding, it would be a blind and rigid application of the exhaustion doctrine to make it a barrier to relief now. Cf. *McKart v. United States,* 395 U.S. 185, 196–197, 89 S.Ct. 1657, 23 L. Ed.2d 194 (1969).

4. A Board regulation permits the hearing examiners to "disclose documentary evidence by reading or summarizing the appropriate document for the alleged violator." 28 C.F. R. § 2.56(e). It may well be questioned whether less than full disclosure is sufficient under either the due process clause or the rules the courts must enforce in exercising supervisory power over the administration of federal criminal justice. Be that as it may, it is clear that no meaningful summary was

██ If there were not far more, it would be a fatal violation of due process that the hearing officers departed in material respects from the agency's own regulations. See, e. g., *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed.2d 681 (1954); *United States ex rel. Donham v. Resor,* 436 F.2d 751, 754 (2d Cir. 1971).

 4. The hearing on the alleged violations fell below any tolerable level of disorder. The solemn decision to terminate a parolee's liberty "calls for some orderly process, however informal." *Morrissey, supra,* 408 U.S. at 482, 92 S.Ct. at 2601. At the point just cited and elsewhere, the *Morrissey* opinion made clear that informality is a permissible trait of the revocation hearing process. See id. at 484, 485, 92 S.Ct. 2593. But the "informal hearing" must, of course, be "structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." Id. at 484, 92 S.Ct. at 2602. There is a level of disorganization, of unguided conversation, and of uncontrolled irrelevancy at which informality becomes prejudicial confusion. The hearing in this case fell repeatedly and inexcusably to that level.

Exuberantly stressing the virtue of informality, the hearing officer in charge allowed much of the hearing to range far beyond the two alleged violations and into scraps of rumor, third- or fourth-hand allegations, and sinister hints all designed to suggest, without remotely proving, that petitioner was roaming about the country misbehaving and seducing others into misbehavior. The parole officer, unsworn and not competently informed, was permitted, despite objections, to give lengthy, unresponsive answers as vehicles for poisonous accusations. Ostensibly to demonstrate that petitioner had been told his travel was restricted to a 75-mile radius, the parole officer said:

"We had a reason for, we had an intelligible reason for restricting his travel. When he went to Bennington, Vermont he gave us names of some people, and what he wanted to do, and I had called the Chief U.S. Probation Officer there and asked him to make some discrete inquiries of the City Counsel, and he checked out the names of the associates that Mr. Carson wanted to go into business with. The attorney for the group, according to the Chief Mr. DeShea, I believe his name is, had been arrested just that week to be front men for the Mafia. It was pretty shakey this business venture, he wanted to open a topless bar, topless bars were not allowed in Vermont at that time. City Counsel would definitely not give a license, because of the associates we felt he might be lapsing into criminal behavior and the restrictions were definitely put on."[5]

Supposedly to explain how the F.B.I. came to arrest petitioner on the *violator warrant* at the address where he said he would be, the parole officer expanded, and was then abetted, as follows:

"Mr. B [parole officer]: What was actually transpiring at that time was the police in Biloxi had contacted the FBI office and sent a TELEX to the FBI Office here and found out that I was the PO on the case and called me

given of any of the documents, and the material in most of the documents was not disclosed at all.

5. The hearing was recorded on cassette tapes, to which the court has listened. The above quotation is from a typewritten transcript, also submitted by the Government. The transcript is frequently inaccurate, incomplete, and orthographically informal. It is accurate enough, however, to be employed as it is herein. The tedium of correcting it would not be rewarded by commensurate improvements in clarity of what the court is deciding or of the reasons therefor. The court is also omitting the liberal sprinkling of "*sics*" that refined scholarship might dictate.

to get some information on the case to get some information on Mr. Carson. Apparently what they were concerned about was the ads Mr. C was running in a local newspaper, a number of local newspapers concerning an ad in general looking for young men, teenagers to come to N.Y. as trainees as managers of rock and roll groups to tour the Orient. The police down there were concerned and felt there were questions with moral turpitude involved and apparently they were in contact with the FBI Office in Miss. The agent who contacted me up here was Ed Ansen * * *

"Mr. Q [hearing officer]: That would be your first knowledge as to where he was .

"Mr. R [attorney for petitioner]: Can I say an objection to this as being totally immaterial and irrelevant to the issue.

"Mr. Q: What we are inquiring is if he was in Biloxi. I'll ask Mr. C did he put ads in the paper? looking for people to work in the business

"Mr. C [petitioner]: Definitely, but not for teenagers as moral turpitude oriented.

"Mr. Q: I'm sure Mr. C you didn't advertise that in the paper about moral turpitude."

In case this irrelevancy might have been lost upon anyone, the parole officer volunteered at a later point:

"I might add also that the Asst. Manager of Empire Hotel was so familiar with Mr. C for the very type of allegation by the police in Biloxi and FBI in Miss. which was that the switchboard was constantly busy at the Hotel Empire in response to adds placed in the Village Voice, 4 people to tour the orient as managers of rock and roll bands and well after he had left the hotel people were still coming by."

When the parole officer lapsed into bizarre ruminations as to whether there were "pending charges" against petitioner, and when counsel had the temerity to respond with sounds a lawyer might make, the hearing officer hardened. His tone is discernible in the cold (and slightly garbled) transcript, but more vivid on the cassette tape. The typed approximation may serve as the last of our illustrative quotations:

"Mr. T.: Mr. Berger, do you have any information as to pending charges anywhere?

"Mr. B.: As to the charges in Rexdale, Ontario—what I have is a letter which I believe I forwarded to the Parole Board and kept a photocopy for myself from one of the accountants at the Holiday Inns in Rexdale, Ontario, the Accounts Receivable section where they sent us a copy of the bill, the hotel room, the charge card . . . .

"Mr. R.: I'm going to object to that. Now you asked him a specific question. You asked him if any charges were pending. He's telling you about a complaint letter from an accountant. Now if Mr. Berger doesn't speak English perhaps we ought to put it to him in some other language. That's the *third* time he's done that. I think it's disgraceful.

"Mr. T.: Are there any specific charges pending anywhere?

"Mr. B.: What she said was that she had contacted the Royal Canadian Mounted Police as the . . .

"Mr. R.: Well, that's not a charge, either. I'm going to object to that. I'm going to ask you to redirect your question and see if Mr. Berger can get it right this time.

"Mr. Q.: Well, Mr. Rubin, let me just tell you something. You know, over here, we're just trying to find the facts. We can inquire into any area that we want. Mr. Carson can admit or deny anything that he wants.

"Mr. R.: I understand that.

"Mr. Q.: But I wish you would not try to restrict Mr. Berger from answering in the best way he thinks he

can handle it. We will decide whether he . . . .

"Mr. R.: Sir, we all have to use the same language if we're going to communicate. If you use the word charges and he answers with a letter of complaint . . . .

"Mr. Q.: The question was any charges filed; Mr. Berger is explaining the charges filed.

"Mr. R.: No, he wasn't. He was misusing the word charges. He knows that accountants don't make charges through the mail.

"Mr. Q.: Your information is, Mister, that there could be charges . . . .

"Mr. B.: That she, that the Holiday Inns had turned the matter over to the Royal Canadian Mounted Police, and as the presentence investigation of the records show, he still owes time to the Canadian jail there, so that *has* to be charges up there even though . . . .

"Mr. Q.: Nothing has been filed in your office of some official . . . .

"Mr. B.: I also received a letter from Mr. Herisko in Massachusetts. He claimed in his letter that——

"Mr. R.: I'm going to object to anything that Mr. Herisko may have said. I think——

"Mr. Q.: Your objection's a note of Counsel. Go ahead, Mr. Berger.

"Mr. B.: He had represented Mr. Carson in a civil matter. And what happened is that he received a five hundred dollar check in payment for services rendered which were double endorsed, and the check was ultimately determined to be stolen from a company, and that he turned the matter over to Cambridge police. I talked to Detective Morrison in Cambridge, who said he was reluctant to file a criminal complaint because his department would not give him money to extradite and he did not call on such a charge.

But at my last contact he was in the process of filing a criminal complaint.

"Mr. Q.: So there could be pending charges?

"Mr. B.: And finally on Monday Mr. Lester Battles came to my office, postal inspector in the Southern District of New York, concerning an investigation of money orders which I think were documented at the time of the preliminary parole hearing in Mississippi by the Chief Probation Officer. I think there were three or four of them and they were trying to determine Mr. Carson's role in these money orders which were determined stolen from a Boston post office——

"Mr. Q.: This would be an investigative stage?

"Mr. B.: Yes."

Enough has been quoted, it is believed, to convey the atmosphere of slovenliness and disarray in which petitioner was invited to defend against being returned to prison. Hearing officers can and must do better. If the administrative hearing room need not resemble a courtroom, it may not become a shambles.

■ 5. Another of the basic decencies assured by *Morrissey*, a familiar device for promoting rational decisions, is the requirement that there be "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 489, 92 S.Ct. at 2604. The court has quoted the formal agency jargon that is urged to satisfy this command in this case. That cannot be sustained. See, e. g., *O'Brien v. Henderson*, 368 F.Supp. 7, 9–10 (N.D.Ga. 1973); *Zizzo v. United States*, 470 F.2d 105, 108 (7th Cir. 1972). Re-imprisonment is by no means the automatic or most frequent consequence of a parole violation. It is a terrible sanction, meant for the serious case. *Morrissey, supra* 408 U.S. at 479, 92 S.Ct. 2593. If routine phrases, merely echoing the generalities of regulations, may be thought to be "reasons" for the given choice, then

the notion of parole board expertise is indeed a sardonic myth.

This is a most vivid case to make the point. The petitioner's violations, discounting the untested gossip and hearsay, were scarcely momentous. The underlying crime for which he first went to prison, though surely not to be condoned, is not among the most terrifying. The supposed reasons why he cannot be trusted to try to be a decent citizen are by no means patent on the record. For the sake of our professed interest in his rehabilitation, and in respect for the law of the land, the parole officials owe some intelligible and discriminating account of why in fact they have concluded to impose the grave punishment they say is needful.

### III.

When it appeared at oral argument that this case might not be judged a triumph of fairness and that the writ might well issue, as it now will, government counsel requested a 30-day stay while the Solicitor General considers an appeal. The court is aware of, and sympathetic to, the needs of orderly government litigation. Nevertheless, considering that petitioner has been held for over four months already, that nobody suggests he is dangerous, that the treatment he has received was shameful, and that his sentence, at its cruelest maximum, appears to have less than a year to go, the request for 30 days of further imprisonment on the ground stated seems unconscionable. Just as the court is constantly asked to make analogous judgments at the Government's behest, see 18 U.S.C. § 3148, the court is led to observe that an appeal in the circumstances of this case would appear to be unsubstantial. Being of this view, but deferring to our appellate superiors, the court will stay its writ for five days to allow time for application to the Court of Appeals or a Judge thereof. If there is no stay by the morning of November 19, 1975, petitioner must be released.

To put the determination precisely, the petition is granted and petitioner will be released before 11 a. m. on November 19, 1975.

It is so ordered.