**Dr. Saeed GABALLAH, Plaintiff,**

v.

**Richard ROUDEBUSH et al., Defendants.**

**Nos. 72 C 1973, 73 C 2681.**

United States District Court,
N. D. Illinois, E. D.

Oct. 18, 1976.

Davis, Miner & Barnhill, Chicago, Ill., for plaintiff.

Joseph R. Curcio, Michael D. Stevenson, Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM

LEIGHTON, District Judge.

### I

This is a consolidation of two suits brought to obtain injunctive relief and other redress from an alleged systematic course of discriminatory conduct directed at the plaintiff because of his race, national origin and religion. Jurisdiction of this court is invoked under Title VII of the 1964 Civil Rights Act as amended and 28 U.S.C. § 1331(a). At a non-jury trial, opening evidence, testimonial and documentary, was received; and after plaintiff rested his case, defendants moved for a direct finding in their favor and dismissal of the suits. The motion has been considered; and pursuant to Rules 41(b) and 52(a), Federal Rules of Civil Procedure, it appears that the following are the facts.[1]

### II

Plaintiff Dr. Saeed Gaballah is a naturalized American citizen born in Egypt. He is a Moslem and has a doctorate in biochemistry from the University of Wisconsin. With one exception, all of the defendants are employees of the federal government. Richard Roudebush is the Administrator of the Veterans Administration who has supervision of all matters within that federal agency. Dr. I. James Young is a physician, holder of a doctorate in philosophy; but is no longer a federal employee. From 1965 to 1972, he was chief of neurology service at Downey Hospital, a Veterans Administration installation near Chicago. Dr. Gilbert Bogen is a physician, and for two years prior to the filing of plaintiff's fourth amended complaint, was chief of staff at Downey. Both Dr. Young and Dr. Bogen

---

1. The facts in the statement that follows are supplemental to the findings that have been made by the court.

are white native Americans. Dr. Jae Ro is a physician, a native of Korea, and at the time of this trial was plaintiff's supervisor at Downey. Dr. Ghonsham Sooknandan is of South American birth whose parents were natives of India. From 1968 to 1973, Dr. Sooknandan was chief of laboratory service at Downey and plaintiff's supervisor. The Downey administration employs, in substantial numbers, persons who are members of various ethnic, racial and religious minorities.

In February 1966, Dr. Young selected the plaintiff to work under his supervision as a Chemist GS–12 and chief of the clinical neurochemistry laboratory in the neurology service of Downey Hospital. At the beginning of this relation, warm friendship existed between the two men. Plaintiff and his wife visited the Young home; the Youngs visited with plaintiff and his wife; in fact, they socialized at the same level of the community in which they worked. While working under Dr. Young, plaintiff was promoted to Grade GS–13. His duties required him to do clinical as well as research work, although it was not specified what percentage of time he was to spend on each. But as time went on, Dr. Young relieved plaintiff of certain clinical responsibilities. Then, between late 1967 and the summer of 1971, he became involved in a series of disputes with Dr. Young concerning the quality and quantity of clinical work he was doing, the amount and type of funds for research, and the assignment of persons who were to be his subordinates.

During the same period, sometime in 1968, plaintiff developed a research proposal which dealt with a related enzyme in the central nervous system which chemists and neurologists call cyclic AMP. Subsequently, he sought its funding and approval. The proposal was approved by Dr. Young, Dr. Raulinaitis, the then Downey chief of staff, and by all responsible Veterans Administration personnel. It was funded for two years with the condition that this would be continued if the project showed satisfactory progress. Later reports concerning the project were always favorable.

In 1970, plaintiff submitted another proposal for funding under local research grants administered at Downey. This time, however, Dr. Young informed him that the proposal was similar to a research project of Dr. Held, a Caucasian woman chemist at Downey. Nevertheless, Dr. Young agreed with plaintiff that he could submit the proposal for evaluation by the Research and Education Committee; and subsequently, it was approved.

Also in 1970, early in the year, Dr. Young formulated a composite program in which all members of the neurology service, including plaintiff, were to do neurology research. It was contemplated that plaintiff would thus receive his entire salary from research funds without having any clinical responsibilities. At about the same time, plaintiff was invited to join Drs. Moira Breen and Alan DeWolfe as a new subcommittee of the Research and Education Committee whose functions were to evaluate on-going and newly proposed research projects, including Dr. Young's composite program and research projects he was conducting with a subordinate chemist, James T. Custod, a white native-born American. In performing these functions, the subcommittee on several occasions refused to approve a number of Dr. Young's reports. After these subcommittee disapprovals, Dr. Young retracted his agreement that plaintiff's second research proposal be submitted to the Research and Education subcommittee. He also removed plaintiff from the composite program and reduced his clinical work.

On June 10, 1970, plaintiff, without claiming that his race, national origin or religion were factors in any way, filed a grievance in which he complained only that Dr. Young's actions were "professional discrimination" that prevented him from submitting a research proposal for funding consideration. When the grievance was considered, the hospital director decided it against the plaintiff. Then, on December 11, 1970, Dr. Young submitted his 1972 budget estimates and recommended against continued funding of plaintiff's research

project. A month later, the director of Downey Hospital wrote plaintiff, through channels, telling him that " * * * we are planning to abolish your position on June 30, 1971. The decision to make this change is based on the following:

a. Your position was initially established for the purpose of providing clinical services related to direct patient care through a Clinical Neurochemistry Laboratory. Unfortunately, the needs for clinical neurochemistry services have not developed according to our original expectations. As a result over 75 percent of your time has been devoted to research although your salary has been paid with patient care funds.

b. Your present research project will terminate on June 30, 1971.

c. No other research project has been approved."

On January 22 and 28, 1971, plaintiff, in accordance with regulations, requested a hearing and filed a grievance concerning Dr. Young's actions and the decision to abolish his position. In neither communication did he make any claim of discrimination because of race, national origin, or religion. Instead, he complained about discontinuation of his research project without prior notice and denial of an opportunity to relocate his program in another service. The hearing he requested was held on March 2, 1971; and the issues considered were (1) whether plaintiff's research proposal was reviewed and disapproved by the appropriate authority; (2) whether proper procedures were followed in notifying him that his position was going to be abolished. Thereafter, the hearing officer decided that plaintiff's research project was not reviewed by the proper authority and that the required procedures were not followed in notifying him that his position was going to be abolished. This decision was reversed by the hospital director in a letter dated April 26, 1971 in which he gave his reasons and at the same time reviewed and rejected plaintiff's grievance of January 28, 1971.

The reversal was upheld by the Veterans Administration Control Office; on June 4, 1971, plaintiff was informed that his position as a Chemist GS-13 would be abolished effective July 6, 1971. He was told that in lieu of separation from the service he had the opportunity to accept a demotion to Chemist GS-9 in the Research and Aging Laboratory with his GS-13 salary to continue for a period of two years. Plaintiff accepted this offer; but instead of being assigned as he had been notified, he was placed in the Clinical Laboratory Service under Dr. Sooknandan. The clinical neurochemistry laboratory which plaintiff had headed since 1966 was closed, effective June 30, 1971, with all concerned being notified by the hospital director. Plaintiff appealed to the Civil Service Commission which ruled that in abolishing plaintiff's position at Downey and reducing him in grade, there had been " * * * no violation of the reduction in force regulation and no basis exists for a favorable decision." At about the same time, Dr. Young began a series of changes in his relation with Downey; and by the Fall of 1971, he severed his connection with the installation. James T. Custod, the white researcher, remained a GS-12 doing clinical research in chemistry after plaintiff's position was abolished. Then, from late 1972 to the end of 1975, five positional vacancies occurred at the hospital for which plaintiff, some of his associates, and the director of personnel thought he was qualified. But as to three of these, plaintiff was not considered when they were filled. In none of the instances did he file a grievance under applicable administrative regulations, or institute any complaint proceeding in which he claimed denial of any procedural right or that he had been the subject of discrimination because of his race, national origin or religion.

III

In his memorandum opposing defendants' motion for a direct finding in their favor at the close of his evidence, and for judgment of dismissal, plaintiff argues that between August 1971 when Dr. Young left Downey and July 1972, he was the hospital's only

neurology researcher; that although there were budgeted positions vacant for which he was qualified, he was ignored in the efforts to fill them; therefore, under the order of proof in Title VII cases established by the United States Supreme Court in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), his evidence makes out a prima facie case of racial discrimination because it shows that he was a qualified minority employee who was treated worse than a non-minority employee in an analogous circumstance. The same showing, and the same application of the *McDonnell-Douglas* formula, plaintiff argues, is true of his reduction to Grade GS–9 in July 1971. Finally, he argues that as to his Fifth Amendment federal question case against Drs. Young, Bogen, Sooknandan and Ro, his evidence establishes that with regard to his reduction in grade, and the five positional vacancies that occurred at Downey between 1972 and 1975, they did not follow their own regulations; that is, those governing preference considerations to which a reduced-in-grade employee of the agency was entitled when there was an opportunity for promotion; therefore, these defendants deprived him of the due process of law for which they were answerable in these suits.

Defendants have filed answering memoranda in which they argue that although plaintiff accurately states the *McDonnell-Douglas* rule, the evidence at the time he rested does not meet the requirements of that case; that when examined, his evidence, even if it remains uncontradicted, does not show that a case for relief has been made; that recent decisions of the United States Supreme Court, four while their motion has been under consideration, establish that plaintiff's evidence, even viewed most favorable to him, does not establish a case for relief from this court; that as to plaintiff's Fifth Amendment case against Drs. Young, Bogen, Sooknandan and Ro, the same recent decisions, and some by courts of appeals in other circuits, clearly show that the 1972 amendment to Title VII of the Civil Rights Act of 1964 is the exclusive individual remedy for a federal employee who complains of a job-related discrimination; and that, in any event, the defendants Young, Bogen, Sooknandan and Ro did not reduce plaintiff in grade; they had nothing to do with the fact, if true, that plaintiff was not given preferential consideration when five positional vacancies occurred at Downey between 1972 and 1975, this was done by those in the Veterans Administration who had the authority to do so. Therefore, these four defendants insist that plaintiff's suit against them must be dismissed at the close of his evidence because this court has no jurisdiction to grant relief on the proof made.

Thus, defendants' motion, as argued by the parties, presents two issues. 1. Whether the 1972 amendment to Title VII of the Civil Rights Act of 1964 is the exclusive individual remedy available to a federal employee complaining of a job-related discrimination. 2. Whether plaintiff's evidence made out a case upon the facts and the law showing his right to the relief he seeks as a federal employee.

IV

When the Civil Rights Act of 1964 was adopted, the term "employer," as defined in Title VII, excluded the United States, any of its corporations, any Indian tribe, or any District of Columbia department or agency which by statute was subject to procedures of the competitive service. See Pub.L. 88–352, Title VII, § 701, July 2, 1964, 78 Stat. 253. Therefore, the Act's prohibitions against job-related discrimination did not apply to an applicant for federal employment, nor did they apply to a person who was a federal employee. *Baca v. Butz,* 394 F.Supp. 888 (D.N.M.1975). Two years later, however, Congress expressed its policy against discrimination in employment opportunities within the federal government, although it provided no judicial proceeding by which such practices could be prohibited. See 5 U.S.C. § 7151; Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 523. Implementation of the policy was left to executive orders issued by the President with enforcement administered through rules and regulations of the Civil Service Commission.

As a result, none of the executive orders, and there were several,[2] could give either an applicant for federal employment or a federal employee the right to institute a civil suit against the federal government even if it could be established that one of its agencies was guilty of invidious discrimination with relation to an employment opportunity. See *Gnotta v. United States,* 415 F.2d 1271 (8th Cir. 1969). This fact generated growing dissatisfaction with the administrative remedies established by the executive orders. The dissatisfaction served to highlight the necessity for appeal to the courts by an applicant or a federal employee who claimed to be the victim of a job-related discrimination. It revealed the seemingly unaggressive way in which the Civil Service Commission worked toward eradicating discrimination in federal employment. As a result, Congress in 1972 became convinced that its 1964 statute had to be amended by a section which would open the federal government to suits for employment personnel actions which were motivated by considerations of race, color, religion, sex or national origin. See Senate Report No. 92–415, 1st Sess. 16 (1971); House Report No. 92–238, 1st Sess. 25 (1971); 2 U.S.Cong. & Admin.News 1972, pp. 2137, 2160.

Accordingly, the Civil Rights Act was amended by a provision which required that as to the federal service "[a]ll personnel actions affecting employees or applicants for employment * * * shall be made free from any discrimination based on race, color, religion, sex or national origin." 42 U.S.C. § 2000e–16(a); Pub.L. 88–352, Title VII, § 717, as added Pub.L. 92–261, § 11, March 24, 1972, 86 Stat. 111. Enforcement of these added provisions was left to the Civil Service Commission which had authority to issue rules and regulations binding on heads of all federal departments, agencies or units. The Commission was given power to enforce the amendment " * * * through appropriate remedies, including reinstatement or hiring of employees with or without back pay * * *." 42 U.S.C. § 2000e–16(b). After exhaustion of the amendment's administrative remedies, federal employees or applicants for employment, like similarly situated persons in the public sector, could file a civil action in an appropriate United States District Court " * * * in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant." See *Archuleta v. Callaway,* 385 F.Supp. 384 (D.Colo.1974); 42 U.S.C. § 2000e–16(c); 2 U.S.Cong. & Admin.News 1972, pp. 2157, 2160. If a job-related discrimination based on race, color, religion, sex or national origin is proved, the district court, within its equitable jurisdiction, could order employment, promotion or any other deprived benefit, back pay or lost income, and injunctive relief if necessary. *Parks v. Dunlap,* 517 F.2d 785 (5th Cir. 1975), *Parks v. Brennan,* 389 F.Supp. 790 (N.D.Ga.1974). As judicially construed, the amendment retroactively applied to any administrative proceeding pending at the time of its enactment. *Grubbs v. Butz,* 169 U.S.App.D.C. 82, 514 F.2d 1323 (1975). And in *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) it was held that the amendment provides the exclusive judicial remedy for claims of discrimination in federal employment. But even before *Brown,* lower federal courts had either decided that federal law precluded any action by a federal employee against his supervisors except within the framework of the 1972 amendment to Title VII, or suggested that no suit could be brought against supervisors of federal employees except under a statute like the one Congress adopted in 1972 when it amended the Civil Rights Act of 1964.[3]

---

**2.** See Executive Order No. 11246, Sept. 24, 1965, 30 Fed.Reg. 12319, as amended by Executive Order No. 11375, October 13, 1967, 32 Fed.Reg. 14303 and Executive Order No. 11478, Aug. 8, 1969, 34 Fed.Reg. 12985.

**3.** See *Archuleta v. Callaway,* 385 F.Supp. 384 (D.Colo.1974); *Keeler v. Hills,* 408 F.Supp. 386 (N.D.Ga.1975); *Taylor v. Gillis,* 405 F.Supp. 542 (E.D.Pa.1975); *Ellis v. Naval Air Rework Facility Alameda, Cal.,* 404 F.Supp. 377 (N.D.

Notwithstanding the importance of these authorities, plaintiff insists they do not apply to his case. He argues that he is doing more than proceeding against the head of the agency that employs him; he is claiming federal question jurisdiction in this court under 28 U.S.C. § 1331 and alleging deprivation of Fifth Amendment due process rights by his former superiors, Drs. Young, Bogen, Sooknandan and Ro. Plaintiff contends they violated their own Veterans Administration personnel regulations and denied him his rights to preferential consideration with regard to the five positional vacancies that occurred at Downey Hospital between 1972 and 1975. Therefore, he concludes that not only can he sue the head of his federal agency; he can sue his former superiors individually and seek to recover from them, jointly or severally, $100,000 in actual damages, $750,000 in punitive damages, plus costs.

Plaintiff's contentions and arguments are supported by a well-written brief in which *Bivens v. Six Unknown Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and a number of lower federal court decisions [4] are cited for the proposition that due process of law is denied when federal officials violate the rules and regulations they administer and deprive a person of protected procedural rights. The brief elaborates the point that once a federal agency establishes rules and regulations, the Fifth Amendment requires that the responsible officials obey them. This conclusion, plaintiff's brief asserts, is a basic constitutional principle of administrative law that originated in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); and in *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), one applied in a long line of lower federal court decisions.[5]

This argument, however, overlooks what clearly emerges from plaintiff's case in chief. His former superiors, Drs. Young, Bogen, Sooknandan and Ro, did not administer the personnel regulations which he claims were violated in connection with the positional vacancies in question. Warren Gleason, Personnel Chief at Downey, testified as plaintiff's adverse witness and admitted he was the official responsible for the day to day administration of the regulations on which plaintiff relies. With commendable candor, he conceded that he and his staff were the cause of plaintiff not being given preferential consideration for two of the five positional vacancies which occurred at the hospital between 1972 and 1975. And surprisingly, he attributed this lapse to a lack of familiarity with the particular personnel regulations, pointing out that it was this litigation that brought them to his attention. Plaintiff's prima facie case supports acceptance of Mr. Gleason's explanation; there is no scintilla of evidence that plaintiff's race, national origin or religion had anything to do with those occurrences.

Cal.1975); compare *Blaze v. Moon,* 440 F.2d 1348 (5th Cir. 1971); *Beale v. Blount,* 461 F.2d 1133 (5th Cir. 1972.)

4. *States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146 (4th Cir. 1974); *Hartigh v. Latin,* 158 U.S.App.D.C. 289, 485 F.2d 1068 (D.C. Cir. 1973); *United States ex rel. Moore v. Koelzer,* 457 F.2d 892 (3d Cir. 1972); *Revis v. Laird,* 391 F.Supp. 1133 (E.D.Cal.1975); *Black v. United States,* 388 F.Supp. 805 (E.D.N.Y.1975); *Williams v. Brown,* 398 F.Supp. 155 (N.D.Ill.1975); *United States ex rel. Harrison v. Pace,* 380 F.Supp. 107 (E.D.Penn.1974); *Gardels v. Murphy,* 377 F.Supp. 1389 (N.D.Ill.1974); *Scheunemann v. United States,* 358 F.Supp. 875 (N.D. Ill.1973); *Hill-Vincent v. Richardson,* 359 F.Supp. 308 (N.D.Ill.1973); *Butler v. United States,* 365 F.Supp. 1035 (D.Hawaii 1973).

5. *United States v. Strayhorn,* 471 F.2d 661 (2d Cir. 1972); *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1970); *United States ex rel. Carson v. Taylor,* 403 F.Supp. 747 (S.D.N.Y.1975); *Agron v. Montanye,* 392 F.Supp. 454 (W.D.N.Y. 1975); *Brown v. Lynn,* 392 F.Supp. 559 (N.D. Ill.1975); *Red School House, Inc. v. Office of Economic Opportunity,* 386 F.Supp. 1177 (D.Minn.1974); *Brown v. United States,* 377 F.Supp. 530 (N.D.Tex.1974); *United States v. Ginsburg,* 376 F.Supp. 714 (D.Conn.1974); *United States v. Capra,* 372 F.Supp. 609 (S.D.N. Y.1974); *Berends v. Butz,* 357 F.Supp. 143 (D.Minn.1973); *Mabey v. Reagan,* 376 F.Supp. 216 (N.D.Cal.1974).

What is more important, however, is the fact that the cases cited in plaintiff's brief do not support his argument. Some of them are completely inapposite to the issues in this one. The others are egregious violations of fundamental rights in situations where federal officers acted entirely outside the scope of their authority and the only legal remedy was a suit either invoking the due process clause of the Fifth Amendment or statutes protecting civil rights. In this case, plaintiff, under the same personnel regulations he invokes, had administrative remedies that included appeals either to the Administrator of the Veterans Administration or to the Civil Service Commission. The first of the five vacancies occurred months after the 1972 amendment was adopted. Therefore, plaintiff could have resorted to its provisions and ultimately gained access to judicial review of his claims. He did not do so.

■ Moreover, the preferential consideration to which plaintiff was entitled as a demoted federal employee was given him by the United States through its Veterans Administration personnel regulations. Count II of his most recent complaint, in effect, is a suit against officers of the United States in order to compel preferences conferred by federal regulations. Thus, it is a suit against the government of the United States. *Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). But the United States has not consented to a suit like this one; and since one cannot sue the government without its consent, this court is without jurisdiction of the case plaintiff seeks to make against his former superiors. *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Gnotta v. United States,* 415 F.2d 1271 (8th Cir. 1969).

■ It appears, then, that as to his Fifth Amendment federal question theory, a fatal defect was proved by plaintiff's prima facie case. For this reason, his suit against the individual defendants must be dismissed. Federal law precludes any action by a fed-

eral employee against superiors acting in their official capacity except within the framework of amended Title VII, a statute that provides the exclusive judicial remedy for claims of discrimination in federal employment. *Brown v. General Service Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Archuleta v. Callaway,* 385 F.Supp. 384 (D.Colo.1974); compare *Keeler v. Hills,* 408 F.Supp. 386 (N.D. Ga.1975). Therefore, the only issue before the court is whether plaintiff, at the time he closed his opening presentation, made out a prima facie case. This issue is resolved by a brief summary of the evidence, testimonial and documentary.

## V

Plaintiff called three adverse and seven non-adverse witnesses. He offered and the court admitted 362 exhibits, most of them multi-paged documents. Defendants, pursuant to Rule 106, Federal Rules of Evidence, requested that a number of their writings and recorded statements be considered contemporaneously with certain exhibits which the court had received in evidence. This is the testimonial and documentary proof constituting plaintiff's case in chief.

From it, he argues that in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the court established a rule for Title VII cases in order to deal with the fact that proof of discrimination is seldom direct. In the brief filed for him, plaintiff's lawyers contend that the fundamental idea of *McDonnell-Douglas* is to disregard proof of an employer's subjective motive and disclose instead, through objective circumstances, those employment situations that raise a suspicion of discrimination. "To that end," it is argued, "where a qualified minority employee demonstrates that he has been treated worse than non-minority employees in analogous circumstances, the prima facie case is made out and the burden shifts to the employer to rebut it with a legitimate business reason."

Pursuing this argument, plaintiff insists that at the close of his opening presentation, he made a prima facie case because his evidence established that he was demoted in July 1971 while James Custod, a white, native-born American chemist in an identical situation was allowed to keep his superior rating and continue research in chemistry; that between late 1971 when Dr. Young left Downey and July 1972, there was a massive campaign to recruit persons for the hospital's neurology research laboratory, but he was entirely ignored in the recruitment effort despite his qualifications; and that between 1972 and 1975, five positional vacancies came into existence at Downey, but he, although qualified, was passed over and others were sought and employed. Thus, he concludes that the case he made, prima facie, did not require him to prove more.

Plaintiff's evidence establishes that Downey Veterans Administration Hospital is a large federal facility employing more than 500 persons, many of them scientists. Ethnically, and consistent with federal policy, its employees are a virtual United Nations. Although plaintiff claims he is Downey's only Arab, his evidence contains documents suggesting otherwise. He became an employee of the hospital on February 23, 1966, as chief of the clinical neurochemistry laboratory in the neurology service. The description of his position and the details of his responsibilities bespoke trust and confidence in a chemist of his academic qualifications. His duties included responsibility " * * * for the successful operation and maintenance of various services offered by the isotope section in the Neurology Service. He shall be responsible for its proper scientific and lawful operation conforming to regulations of the Atomic Energy Commission, particularly in purchase, storage, safe-handling, bookkeeping and everyday use of radioisotopes."

In the first 18 months, he performed well in his new position. He earned every increase in salary his position allowed; and he was promoted from Grade 12 to 13. Then, he began having difficulties with Dr. Young. On June 24, 1968, six days before he was due for another increase in salary, Dr. Young informed him that for a number of reasons it was not going to be recommended. For one, Dr. Young said that an Atomic Energy Commission inspection revealed plaintiff had failed to maintain proper radioisotope records for the neurochemistry laboratory. In requesting reconsideration of this decision, plaintiff admitted having placed the wrong construction on his responsibility for the records in question; and admitted that " * * * after review of the accusation and paragraph c(2) of my position description, I see I could be judged remiss." Despite these confessions, the hospital director, with reservations, overruled Dr. Young's recommendation and plaintiff received his salary increase.

However, his conflicts with Dr. Young continued in kind and number. They developed into confrontations concerning funding of research projects proposed by plaintiff, they turned into grievances he initiated complaining of the treatment he was receiving at the hand of his superior; they produced reports, responses and communications that came to the attention of the highest administrative authority at Downey. Then, on January 15, 1971, the hospital director advised plaintiff that his position as chief of the clinical neurochemistry laboratory was going to be abolished on June 30, 1971. Plaintiff was reminded that his position had been established for the purpose of providing clinical services related to direct patient care; that, unfortunately, the need for clinical neurochemistry service had not developed in accordance with original expectations; and it had been observed that more than 75% of his time had been devoted to research, although his salary had been paid from patient care funds.

Plaintiff filed a grievance against this action; but he did not claim being the subject of discrimination because of his race, national origin or religion. He made numerous protests with legislative and congressional representatives; but he did not assert he was in any way the object of race

or religious antipathy. He pursued his grievance to the head of his agency who concluded that abolition of plaintiff's position did not violate any regulatory procedure of the service. A short time before this decision was announced, plaintiff was told that in lieu of separation, he could remain at Downey in the employ of the Veterans Administration as a Chemist GS–9 with his GS–12 salary continued for a two-year period. He accepted this offer and has remained on the hospital staff.

James T. Custod, the white, native-born American plaintiff claims was preferred while he was demoted, is no longer at Downey. Even before the first complaint in this case was filed, Custod was compelled to resign his federal position, and turn over 13 notebooks of research data to the hospital chief of staff because it was learned that contrary to Veterans Administration rules and federal criminal law, he had utilized hospital resources and federally compensated time to pursue a course of study leading to a doctorate at a well-known Chicago university. The defendant Dr. Young became entangled in the Custod investigation; and on December 23, 1971, Dr. Bogen gave him an adverse personnel evaluation that led to his resignation from the Downey staff on January 22, 1972. Therefore, far from showing employment discrimination based on race, national origin or religion, plaintiff's evidence, establishes that Custod, the white man, was engaged in illegal acts that were condemned by Downey authorities when the facts were brought to their attention either by plaintiff or by some unknown informant.

Dr. Young's separation from the Downey staff had a disruptive effect on the hospital's neurology service and its 15 to 17 employees. Minutes of the Research and Education Committee, intra-staff memoranda, reports and communications between the responsible officials, disclose that Dr. Young's resignation, although expected, made necessary a reorganization of an important unit of the hospital. There is evidence that plaintiff was aware of these developments; and in some instances partook in discussions concerning them.

During the year that followed this development, plaintiff was a subordinate of Dr. Bogen, the Chief of Staff, and under the immediate supervision of Dr. Sooknandan. The prima facie evidence shows that throughout the period in question he was the subject of discussion and concern by those who administered Downey Hospital. It is evident from the admitted documents that plaintiff had not been a good staff chemist under Dr. Young. He was the frequent subject of critical memoranda and adverse communication from Dr. Bogen. He did not get along with Dr. Sooknandan who succeeded Dr. Young as plaintiff's supervisor and on several occasions found it necessary to criticize him because of unauthorized absences from his place of work and his misuse of government equipment that had been assigned to him. Thus, it appears from plaintiff's own evidence that his performance as a staff chemist explains why he did not benefit from whatever promotion opportunities came into existence at Downey between late 1971 when Dr. Young left the hospital and the end of the year 1972.

With regard to the five positional vacancies between 1972 and 1975, plaintiff's evidence shows that the first occurred in October 1972, and the last in October 1975. The admitted documents make it clear that his superiors considered him qualified for three of them but did not select him. Plaintiff knew of each vacancy. And as to those for which he was considered and not selected, he was told of the decision. The 1972 amendment that gave federal employees the right to sue for relief against job-related discrimination went into effect on March 24, 1972. See 42 U.S.C. § 2000e–16. Consequently, if plaintiff had ground to believe that the decisions not to select him for one of the vacancies were motivated by his race, national origin or religion, he could have resorted to the administrative remedies under the amendment; and if relief were denied him, he could have filed a district court suit against the head of his

agency. Plaintiff complained to no one. In fact, until he filed his fourth amended complaint after resting his case in chief, he never claimed that in connection with any of the five positional vacancies he had been the subject of a job-related discrimination because of his race, national origin or religion. Not having sought administrative relief under the 1972 amendment, and this fact being established by his prima facie case, plaintiff's suit, insofar as it concerns the five positional vacancies, cannot proceed against Roudebush, head of the federal agency that employs him. *Gissen v. Tackman,* 537 F.2d 784 (3rd Cir. 1976).

■ Therefore, plaintiff's evidence, no matter how viewed, does not make out a case that must be rebutted. It does not establish prima facie that as a qualified minority employee he was treated worse than non-minority employees in the circumstances referred to. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); compare *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972); *Muller v. United States Steel Corp.,* 509 F.2d 923 (10th Cir. 1975). Nor does it show that as a federal employee he was subjected to a systematic course of discrimination because of his race, national origin or religion. For these reasons, defendant Roudebush's motion for a direct finding in his favor and dismissal of the suits at the close of plaintiff's case must be granted. *Woods v. North American Rockwell Corporation,* 480 F.2d 644 (10th Cir. 1973); *Blount v. Xerox Corporation,* 405 F.Supp. 849 (N.D.Cal.1975). Accordingly, an appropriate order in form and substance consistent with the views expressed in this memorandum may be presented for approval and entry.

So ordered